# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JULIE FRIEDMAN, derivatively on behalf of EXPEDIA, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DARA KHOSROWSHAHI, BARRY DILLER, VICTOR A. KAUFMAN, A. GEORGE BATTLE, JONATHAN L. DOLGEN, CRAIG A. JACOBSON, PETER M. KERN, JOHN C. MALONE, JOSE A. TAZON and WILLIAM R. FITZGERALD, | ) ) ) ) ) ) ) ) | C.A. No. 9161-CB |
| Defendants, | ) ) | |
| and | ) ) | |
| EXPEDIA, INC., a Delaware Corporation, | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  June 16, 2014
Date Decided:  July 16, 2014

David A. Jenkins and Neal C. Belgam of Smith Katzenstein & Jenkins LLP, Wilmington, Delaware; Eduard Korsinsky and Steven J. Purcell of Levi & Korsinsky LLP, New York, New York, Attorneys for Plaintiff.

Gregory P. Williams, Lisa A. Schmidt and Susan M. Hannigan of Richards, Layton & Finger, P.A., Wilmington, Delaware; Warren R. Stern and Jonathon R. LaChapelle of Wachtell, Lipton, Rosen & Katz LLP, New York, New York, Attorneys for Defendants.

**BOUCHARD, C.**

1

## I.  INTRODUCTION

This action involves a seemingly increasing area of litigation in this Court: claims challenging the payment of compensation to an officer or director of a Delaware corporation based on an alleged violation of the terms of a compensation plan. Asserting such claims derivatively, stockholders invariably argue that demand is excused on the theory that a violation of an unambiguous provision of a compensation plan raises a reasonable doubt the transaction resulted from a valid exercise of business judgment and, as the plaintiff here put it, "*ipso facto* establishes demand futility under the second prong of *Aronson.*"[1]

In this case, plaintiff Julie Friedman asserts claims for breach of fiduciary duty (Count I) and unjust enrichment (Count II) concerning the decision of the compensation committee of the board of directors of Expedia, Inc. ("Expedia" or the "Company") to accelerate the vesting of a grant of restricted stock units representing 400,000 shares of Expedia common stock (the "RSU Award") even though one of the original vesting conditions of the RSU Award had not been satisfied. The RSU Award was made to Expedia's chief executive officer Dara Khosrowshahi under the Company's 2005 Stock and Annual Incentive Plan (the "Plan").

Defendants moved to dismiss the complaint for failure to make a pre-suit demand upon the Expedia board of directors or to plead facts excusing such a demand and for failure to state a claim upon which relief can be granted. For the reasons set forth below,

---

[1] Pl.'s Answering Br. 23.

I conclude that this case should be dismissed under Rule 23.1 because plaintiff has failed to plead with particularity that making a demand would have been futile. Regarding the second prong of *Aronson*, I find that defendants have articulated a reasonable construction of the plain terms of the RSU Award whereby the compensation committee was entitled to waive the challenged vesting condition in accordance with their authority under the Plan. At most, plaintiff has identified a potential ambiguity in the RSU Award that the compensation committee was authorized to interpret under the terms of the Plan. Thus, plaintiff has failed to plead particularized facts raising a reasonable doubt that the transaction resulted from a valid exercise of business judgment.

## II. BACKGROUND[2]

### A. The Parties

Plaintiff Julie Friedman has been a stockholder of Expedia since 2005.

Expedia, a Delaware corporation, is an online travel company that provides business and leisure travelers with tools and information enabling them to research, plan and book travel. Expedia became an independent publicly traded company on August 9, 2005, when it was spun-off from IAC/InterActiveCorp.

Defendants Dara Khosrowshahi, Barry Diller, Victor A. Kaufman, A. George Battle, Jonathan L. Dolgen, Craig A. Jacobson, Peter M. Kern, John C. Malone, Jose A. Tazon, and William R. Fitzgerald were all members of the Expedia board of directors in

---

[2] Unless otherwise noted, the facts recited in this Memorandum Opinion are based on the allegations in the complaint, documents integral to or incorporated in the complaint, or facts of which the Court may take judicial notice.

August 2012 when the decision was made to accelerate the vesting of the RSU Award. Each of these individuals except Fitzgerald, who left the board in December 2012, was a member of the board when this lawsuit was filed on December 13, 2013. Pamela L. Coe, who is not named as a defendant, joined the Expedia board in November 2012.

Defendants Dolgen, Kern and Fitzgerald comprised the board's compensation committee (the "Compensation Committee" or "Committee") at all times relevant to this action.

### B. Factual Background

#### 1. The 2005 Stock and Annual Incentive Plan

On August 8, 2005, Expedia adopted its 2005 Stock and Annual Incentive Plan, which was approved by Expedia's then-sole stockholder shortly before the Company went public. The Plan was subsequently amended in 2007, 2008 and 2009, each time with the approval of the Company's stockholders. The Plan authorizes the Company to grant various stock-based awards to Expedia's directors, officers, employees and consultants.[3]

The Plan is administered by the Compensation Committee, which has "plenary authority to grant Awards pursuant to the terms of the Plan to Eligible Individuals" and the authority, "subject to Section 12, to modify, amend or adjust the terms and conditions of any Award, at any time or from time to time."[4] Section 12(d) of the Plan provides,

---

[3] Expedia, Inc., 2005 Stock and Annual Incentive Plan (Form S-8) 5 (Aug. 9, 2005) (the "Plan") (Defs.' Opening Br. Ex. A § 2(a)(ii)).

[4] Plan §§ 2(a), 2(a)(v).

4

with certain exceptions not relevant here, that "the Committee may unilaterally amend the terms of any Award theretofore granted, prospectively or retroactively, but no such amendment shall . . . cause a Qualified Performance-Based Award to cease to qualify for the Section 162(m) Exemption."[5]

The term "Section 162(m) Exemption" is defined in the Plan to mean "the exemption from the limitation on deductibility imposed by Section 162(m) of the [Internal Revenue Code of 1986] that is set forth in Section 162(m)(4)(C)" thereof.[6] Under Section 162(m)(1), publicly held corporations may not deduct compensation in excess of $1 million paid to certain executive officers in a taxable year.[7] Section 162(m)(4)(C) provides an exception to this limitation, if, among other things, payment of the compensation is made contingent upon the achievement of one or more "performance goals" established by a committee of two or more independent directors.[8]

### 2. Qualified Performance-Based Awards

When the Compensation Committee grants an award it may designate the award as a "Qualified Performance-Based Award."[9] Under the Plan, a Qualified Performance-Based Award is "an Award intended to qualify for the Section 162(m) Exemption."[10]

---

[5] *Id*. § 12(d).

[6] *Id*. § 1(kk).

[7] 26 U.S.C. § 162(m)(1).

[8] 26 U.S.C. § 162(m)(4)(C).

[9] Plan § 7(b)(i).

[10] *Id.* § 1(gg).

Therefore, to issue a Qualified Performance-Based Award, the Compensation Committee must condition the award upon the achievement of one or more performance goals.

The term "Performance Goals" is defined in Section 1(dd) of the Plan to mean "the performance goals established by the Committee in connection with the grant of Restricted Stock, Restricted Stock Units or Bonus Awards or other stock-based awards."[11] Section 1(dd) further provides that, "[i]n the case of Qualified-Performance Based Awards that are intended to qualify under Section 162(m)(4)," the Performance Goals must be "based on the attainment of one or any combination" of the following twenty-four criteria:

> specified levels of earnings per share from continuing operations, net profit after tax, EBITDA, EBITA, gross profit, cash generation, unit volume, market share, sales, asset quality, earnings per share, operating income, revenues, return on assets, return on operating assets, return on equity, profits, total shareholder return (measured in terms of stock price appreciation and/or dividend growth), cost saving levels, marketing-spending efficiency, core non-interest income, change in working capital, return on capital, and/or stock price, with respect to the Company or any subsidiary, division or department of the Company that are intended to qualify under Section 162(m)(4)(c) of the Code . . . .[12]

Although the Compensation Committee must condition a Qualified Performance-Based Award upon the achievement of one or more Performance Goals, nothing in the Plan prevents the Compensation Committee from making a Qualified Performance-Based Award subject to the achievement of other terms or conditions. Rather, Section 11(b) of the Plan states expressly that "[e]ach Qualified Performance-Based Award (other than an

---

[11] *Id*. § 1(dd).

[12] *Id*.

6

Option or Stock Appreciation Right) shall be earned, vested and payable (as applicable) only upon the achievement of one or more Performance Goals, together with the satisfaction of *any other conditions*, such as continued employment, *as the Committee may determine to be appropriate*." [13]

Significant to this action, with certain exceptions not relevant here, Section 11(b) prohibits the Compensation Committee from amending a Qualified Performance-Based Award in a way that would cause it to lose its Section 162(m) Exemption:

> [N]o Qualified Performance-Based Award may be amended, nor may the Committee exercise any discretionary authority it may otherwise have under this Plan with respect to a Qualified Performance-Based Award under this Plan, in any manner that would cause the Qualified Performance-Based Award to cease to qualify for the Section 162(m) Exemption . . . . [14]

A Qualified Performance-Based Award would lose its tax-deductible status by virtue of the Section 162(m) Exemption if the Compensation Committee waived any of the Performance Goals it established when the award was granted for the purpose of making the award qualify as a Qualified Performance-Based Award. [15]

### 3. The RSU Award

On March 7, 2006, the Compensation Committee granted 800,000 restricted stock units ("RSUs") to Khosrowshahi. An award of RSUs is denominated in shares of

---

[13] *Id*. § 11(b) (emphasis added).

[14] *Id*.

[15] Compl. ¶ 28.

7

Expedia common stock that will settle in cash or shares upon satisfaction of whatever vesting conditions the Compensation Committee has established.[16]

The terms and conditions of the RSU Award were initially set forth in a March 2006 Restricted Stock Unit Agreement. Section 1 of that agreement sets forth certain vesting conditions. Specifically, Section 1(b) provides that the RSU Award will vest upon the achievement of both (1) one of two specifically defined "Performance Goals" relating to the Company's EBITA or stock price and (2) an additional goal defined as the "OIBA Target." These goals are defined collectively as the "Combined Goals:"

> (b) Subject to the terms and conditions of this Agreement and the provisions of the Plan, the Restricted Stock Units shall vest and no longer be subject to any restriction . . . in the event both (i) one of the two performance goals approved by the Committee (the "Performance Goals") and relating to EBITA or the Corporation's stock price is achieved and (ii) the OIBA Target (as defined below) is achieved (collectively, the "Combined Goals") . . . .[17]

The term "OIBA Target" is defined in the RSU Award as follows:

> "OIBA Target" as used herein means that certain Corporation operating income before amortization ("OIBA") target approved by the Committee with respect to the vesting of Restricted Stock Units awarded to the Eligible Individual under this Agreement.[18]

On March 13, 2006, shortly after granting the RSU Award, Expedia filed a Form 8-K with the Securities and Exchange Commission summarizing Khosrowshahi's

---

[16] Plan § 7(a).

[17] Expedia, Inc., Annual Report (Form-10K) Ex. 10.16 (Mar. 31, 2006) (the "RSU Award") (Defs.' Reply Br. Ex. E §1(b)) (emphasis added).

[18] *Id.*

8

compensation arrangements with Expedia.[19] Parroting the language of the RSU Award, the Form 8-K distinguishes between the "Performance Goals" and the OIBA Target in describing the vesting conditions for the RSU Award:

> The Committees have approved the issuance of 800,000 restricted stock units . . . to Mr. Khosrowshahi, 75% of which will vest . . . upon the Company's achievement of (i) one of the Performance Goals, and (ii) the operating income before amortization ("OIBA") targets approved by the Committees.[20]

Consistent with the text of the RSU Award, the term "Performance Goals" is defined in the Form 8-K as "the Company's achievement of a target increase in the price of the Company's common stock or the attainment of EBITA targets."[21]

### 4. Amendment of the RSU Award

On December 20, 2011, Expedia completed the spin-off of its TripAdvisor Media Group into a new, separately traded public company, TripAdvisor, Inc.[22] When the spin-off occurred, the EBITA/stock price goal in the RSU Award had been met but the OIBA Target had not been met.[23]

Upon consummation of the spin-off, Khosrowshahi became a director of TripAdvisor while maintaining his positions as chief executive officer and a director of Expedia. Expedia and TripAdvisor agreed to divide the RSU Award. Specifically,

---

[19] Expedia, Inc., Current Report (Form 8-K) (Mar. 13, 2006) (Defs.' Opening Br. Ex. B).

[20] *Id*. § 1.01.

[21] *Id*.

[22] Compl. ¶ 39.

[23] *Id.* ¶ 40.

Khosrowshahi entered into a restricted stock unit agreement with TripAdvisor for 400,000 shares of TripAdvisor common stock. Separately, his RSU Award with Expedia was amended to reduce the number of restricted stock units from 800,000 shares to 400,000 shares of Expedia common stock and to reduce the OIBA Target from $1 billion for a full year to $714.4 million.[24]

The terms of the RSU Award with Expedia, as amended in 2011, are set forth in the Second Amended and Restated Expedia, Inc. Restricted Stock Unit Agreement. Similar to the original agreement, the vesting condition in the amended agreement uses defined terms to explicitly distinguish between targets based on EBITA and the Company's stock price (defined as the "Performance Goals") and based on OIBA (defined as the "Expedia OIBA Target"):

> (b)  Subject to the terms and conditions of this Agreement and the provisions of the Plan and subject to the Eligible Individual's continuous Service through the applicable vesting dates, the Restricted Stock Units shall vest and no longer be subject to any restriction . . . as set forth below in the event both (i) *one of the two performance goals approved by the Committee (the "Performance Goals")* and relating to EBITA or the Corporation's stock price is achieved and (ii) *the Expedia OIBA Target* (as defined in Exhibit A) is achieved (collectively, the "Combined Goals") . . . .[25]

---

[24] *Id.* ¶ 43.

[25] Defs.' Opening Br. Ex. D §1(b) (emphasis added).

10

### 5. The Vesting of RSU Award and Subsequent Amendment of Plan

On August 2, 2012, Expedia entered into a new employment agreement with Khosrowshahi.[26] As part of this new employment agreement, Expedia's management recommended, and the Compensation Committee approved, the acceleration and vesting of the RSU Award even though the OIBA Target,[27] as amended in connection with the TripAdvisor spin-off, had not been met.[28]

In a 2013 proxy statement, quoted (in part) in the complaint, the Company stated that the OIBA Target was a "business goal" and that the EBITA/stock price goals included in the definition of the term "Performance Goals" in the RSU Award were designed to satisfy the requirements of Section 162(m):

> [M]anagement recommended, and the Compensation Committees approved, accelerated vesting of 400,000 restricted stock units held by Mr. Khosrowshahi (the "*Khosrowshahi Performance RSU Award*") that had been subject to the achievement of a business goal tied to the operating income before amortization ("OIBA") of the Company, which had not at that time been achieved. In addition, the vesting of the Khosrowshahi Performance RSU Award was separately subject to the satisfaction of either of two goals tied to stock price performance or growth in EBITA, which had been achieved, and which were designed to satisfy the requirements of Section 162(m) of the Code.[29]

---

[26] Compl. ¶ 44.

[27] Although the OIBA target had been redefined in the 2011 amended agreement as the "Expedia OIBA Target," this opinion will refer to the "OIBA Target" for the sake of simplicity.

[28] *Id.* ¶ 45 (quoting Expedia, Inc., Definitive Proxy Statement (Schedule 14A) 43 (Apr. 30, 2013) ("2013 Proxy") (Defs.' Opening Br. Ex. C at 43)).

[29] 2013 Proxy at 43.

11

On February 28, 2013, the Board adopted various amendments to the Plan.[30]  In particular, the Board removed the language from Sections 11(b) and 12(d) of the Plan stating that the Compensation Committee could not amend a Qualified Performance-Based Award in a way that would cause the award to cease to qualify for the 162(m) Exemption.[31]  Focusing on these amendments, Friedman accuses the Expedia board of "attempting to hide its misconduct after the fact by purging the violated terms from the Plan."[32]

The complaint alleges that the Company "has been and will be damaged" by defendants' actions.[33]  It does not allege, however, that Expedia has ever lost the ability to take a tax deduction concerning the RSU Award.

## C.    Procedural History

On December 13, 2013, Friedman commenced this derivative action on behalf of Expedia asserting two claims for relief.  Count I asserts that defendants breached their fiduciary duty of loyalty by accelerating the vesting of the RSU Award in violation of the Plan because the OIBA Target had not been met and then engaging in efforts to conceal their misconduct by amending the Plan.  In Count II, Friedman contends that

---

[30] Compl. ¶ 51.

[31] 2013 Proxy at A-13 to A-14; Compl. ¶ 53.

[32] Compl. ¶ 54.

[33] *Id.* ¶ 79.

12

Khosrowshahi was unjustly enriched when vesting of his RSU Award was accelerated in violation of the Plan.

On January 31, 2014, defendants moved to dismiss the complaint in its entirety for failure to make a pre-suit demand upon the Expedia board of directors or to plead facts excusing such a demand and for failure to state a claim upon which relief can be granted.

## III. LEGAL ANALYSIS

For the reasons explained below, I conclude that demand was not excused and that both claims in the complaint should be dismissed for failure to make a pre-suit demand under Rule 23.1. To analyze this question, it is important to first consider the competing interpretations of the RSU Award that have been presented because this issue underlies the fiduciary duty and unjust enrichment claims that have been asserted.

### A. The Parties' Interpretations of the RSU Award

Under Section 162(m), a publicly held corporation can take a tax deduction for performance-based compensation in excess of $1 million paid to certain executives in a taxable year if the compensation is contingent upon the achievement of one or more performance goals as defined by the Internal Revenue Code. Specifically, under Subsection 162(m)(4)(C), "performance-based compensation" in excess of $1 million paid to a "covered employee" shall be tax-deductible if the compensation is "payable solely on account of the attainment of one or more performance goals" and if, among other things, "the performance goals are determined by a compensation committee of the board of directors of the taxpayer which is comprised solely of 2 or more outside

13

directors."[34] To qualify as a performance goal under Section 162(m), the goal must be selected from a list of pre-established, objective, stockholder-approved business criteria.[35]

As noted above, Section 1(dd) of the Plan defines "Performance Goals" to mean "the performance goals established by the Committee in connection with the grant of" a stock-based award.[36] This section further provides that "[i]n the case of Qualified-Performance Based Awards that are intended to qualify under Section 162(m)(4)," a Performance Goal must be based on the attainment of one or any combination of twenty-four specified criteria.[37] In this case, as explained above, the RSU Award conditioned the vesting of the RSUs on the attainment of (1) one of two "Performance Goals" (a defined term) and (2) the "OIBA Target" (a separately defined term), which together comprise the "Combined Goals" (a third defined term).[38]

The term "Performance Goals" is defined in the RSU Award to mean "one of two performance goals approved by the Committee . . . relating to EBITA or the Corporation's stock price."[39] It is undisputed that both of these goals fall within the

---

[34] 26 U.S.C. § 162(m)(4)(C)(i).

[35] 26 C.F.R. § 1.162-27(e)(2)(i)-(ii).

[36] Plan § 1(dd).

[37] *See supra* note 12 (quoting Plan § 1(dd)).

[38] RSU Award § 1(b).

[39] *Id.*; Defs.' Opening Br. Ex. D § 1(b).

14

twenty-four criteria listed in Section 1(dd) of the Plan from which the Compensation Committee may seek to satisfy the performance goal requirement of Section 162(m)(4).[40]

Defendants argue that "OIBA," which means operating income before amortization, is not among the list of twenty-four criteria listed in Section 1(dd) and thus cannot serve as one of the performance goals that may be selected to satisfy the Section 162(m)(4) requirement. However, the list of twenty-four criteria in Section 1(dd) includes "operating income" and, under Section 1(dd), a goal intended to satisfy Section 162(m)(4) need only be "*based on* the attainment" of a specified level of "operating income."[41] Thus, although the terms "OIBA" and "operating income" are not identical, I assume for purposes of this decision that the Compensation Committee could have used the OIBA Target to satisfy the performance goal requirement of Section 162(m)(4) if it wished to do so.

The critical question is whether the Compensation Committee, when it granted the RSU Award, intended to use the OIBA Target as a performance goal to satisfy the performance goal requirement of Section 162(m)(4) or whether the Compensation Committee intended the OIBA Target to be a separate vesting condition of the Award. This is critical because, as discussed above, Sections 11(b) and 12(d) of the Plan prohibit the Compensation Committee from amending a Qualified Performance-Based Award "in

---

[40] Among the twenty-four criteria listed in Section 1(dd) are goals "based on the attainment of … specified levels of … EBITA … and/or stock price." Plan § 1(dd).

[41] *Id*. (emphasis added).

15

any manner that would cause the Qualified Performance-Based Award to cease to qualify for the Section 162(m) Exemption."[42] Thus, once a performance goal is established for the purpose of satisfying Rule 162(m) when an award is granted, that goal may not be waived. By contrast, Sections 2(a) and 12(d) permit the Compensation Committee to modify or amend any other term or condition of an award.[43] Thus, if the Compensation Committee did not intend to use the OIBA Target as a performance goal to satisfy the requirement of Section 162(m)(4), the Compensation Committee had the authority to waive that condition of the RSU Award.

To make the RSU Award qualify for an exemption under Section 162(m), it was only necessary to establish *one* performance goal.[44] Thus, Section 162(m) could have been satisfied just through the selection of either the EBITA or stock price target referenced in the Award. Moreover, the Compensation Committee could have imposed other vesting goals or conditions on the RSU Award (even ones that fall within the list of twenty-four criteria in Section 1(dd) of the Plan) without intending such goals or conditions to be used to satisfy Section 162(m).[45] Thus, the question remains whether the

---

[42] *See supra* note 14.

[43] *See supra* note 4.

[44] 26 U.S.C. § 162(m)(4)(C) ("The term 'applicable employee remuneration' shall not include any remuneration payable solely on account of the attainment of *one* or more performance goals . . . .") (emphasis added).

[45] Plaintiff's counsel acknowledged as much at oral argument.

> THE COURT: Okay. So now my question to you is, what if they'd done that, and they say, okay, now we want to put some other conditions or other terms on a grant. Is there anything in the plan that prohibits them from

16

Compensation Committee intended to select the OIBA Target as a performance goal for purposes of Section 162(m) when it granted the RSU Award in addition to the EBITA and stock price targets.

Defendants argue that the plain terms of the RSU Award make clear that the Compensation Committee did not select the OIBA Target as a performance goal to satisfy Section 162(m) based on the fact that the RSU Award uses separately defined terms to describe the "Performance Goals" (*i.e.*, the EBITA and stock price targets) and the "OIBA Target" (*i.e.*, the operating income before amortization target). According to defendants, the use of these separately defined terms, the first of which tracks the language of Section 162(m), establishes that the EBITA and stock price targets were intended to satisfy the performance goal requirement of Section 162(m) while the OIBA Target was intended to be a separate, additional goal that the Compensation Committee thus had the authority to waive. In my opinion, this is a reasonable construction of the plain language of the RSU Award.

This construction is consistent with disclosures contained in the Company's 2013 proxy statement describing the Compensation Committee's decision to waive the OIBA Target in the RSU Award. In particular, those disclosures differentiate between the

---

using some of the same metrics, or even derivations of the same metrics that are 1(dd), to independently set up other conditions or terms but not make them Performance Goals, capital P, capital G?

MR. PURCELL: Your Honor, I don't think there's anything in the plan that prohibits that *per se*. I think they could do that.

Oral Argument Tr. at 31:21-32:8 (June 16, 2014).

17

"business goal" of the OIBA Target and the EBITA/stock performance goals "which were designed to satisfy the requirements of Section 162(m) of the Code:"

> [I]n light of Mr. Khosrowshahi's performance and other considerations . . . management recommended, and the Compensation Committees approved, accelerated vesting of 400,000 restricted stock units held by Mr. Khosrowshahi (the "*Khosrowshahi Performance RSU Award*") that had been subject to the achievement of a *business goal tied to the operating income before amortization* ("OIBA") of the Company, which had not at that time been achieved. In addition, the vesting of the Khosrowshahi Performance RSU Award was separately subject to the satisfaction of either of *two goals* tied to stock price performance or growth in EBITA, which had been achieved, and *which were designed to satisfy the requirements of Section 162(m) of the Code*.[46]

For her part, Friedman argues that the OIBA Target was intended to be a performance goal to satisfy Section 162(m)(4) because this goal satisfies one of the twenty-four criteria within Section 1(dd) of the Plan, which delineates the type of performance goals that can be used to make an award qualify under Section 162(m)(4). As discussed above, I assume for purposes of this opinion that OIBA satisfies one of these twenty-four criteria. In further support of her construction, Friedman notes that the Company referred to the EBITA/stock price goals and the OIBA Target, collectively, as the "RSU Performance Goals" in a 2010 proxy statement discussing the RSU Award.[47]

---

[46] 2013 Proxy at 43 (emphasis added). This section of the proxy statement was quoted, in part, in the complaint. Compl. ¶ 45. Thus, I view the foregoing passage to be integral to the complaint and appropriate to consider in its full context on a motion to dismiss. *In re New Valley Corp. Deriv. Litig.*, 2001 WL 50212, at *4 (Del. Ch. Jan. 11, 2001) ("The Court may, however, 'consider, for certain purposes, the content of documents that are integral to or are incorporated by reference into the complaint.'") (citation omitted).

[47] The 2010 proxy statement states, in relevant part, as follows:

Regarding the disclosure in the 2013 proxy statement quoted above, Friedman argues that this disclosure was made after defendants had violated the Plan with the intention of concealing their violation. Friedman notes that the same proxy statement sought stockholder approval of certain changes to the Plan, including amendments to Section 11(b) and 12(d) to eliminate the prohibition on the Committee's ability to amend a Qualified Performance-Based Award in a manner that would cause the award to cease to qualify as tax-deductible performance-based compensation under Section 162(m). According to Friedman, defendants attempted to slip these changes by the stockholders by characterizing them as "administrative changes."[48]

In my opinion, Friedman's interpretation cannot logically be squared with the use of separately-defined terms in the RSU Award differentiating between the "Performance Goals" and the "OIBA Target." To my mind, moreover, the disclosure in the 2010 proxy statement characterizing the "OIBA Target" as one of the "RSU Performance Goals,"

---

*2006 RSU Award.* On March 7, 2006, the Compensation Committee approved certain compensation arrangements with Mr. Khosrowshahi, including the grant of 800,000 RSUs pursuant to the Expedia 2005 Plan (the "2006 RSU Award"). As of December 31, 2009, all 800,000 of these RSUs remained unvested. Of these RSUs, 75% will vest . . . upon Expedia's (i) achievement of OIBA of $1.0 billion for a full fiscal year, adjusted as described below (the "OIBA Target"), and (ii) satisfaction of certain other performance goals, which goals have subsequently been satisfied, tied to the Company's stock price performance or growth in EBITA (collectively with the OIBA Target, the "RSU Performance Goals").

Expedia, Inc., Definitive Proxy Statement (Schedule 14A) 42 (Apr. 27, 2010).

[48] Compl. ¶¶ 51-58.

which was not referenced in the complaint,[49] appears to be a simple mischaracterization of the plain terms of the original RSU Award. Notably, that disclosure predated the amendment to the RSU Award in 2011, which reiterated the distinction between the defined terms "Performance Goals" and "OIBA Target" as those terms were used in 2006 in the original RSU Award.

Whether or not one views Friedman's construction of the RSU Award to be reasonable, at most it shows there may be an ambiguity concerning whether the OIBA Target was intended to satisfy Section 162(m) when the RSU Award was granted. In that regard, another provision of the Plan is salient.

Under Section 2(a)(vii), the Compensation Committee has the authority "to interpret the terms and provisions of the Plan and *any Award issued under the Plan* (and any agreement relating thereto)."[50] This provision dovetails with Section 13 of the RSU Award, which states that "[i]n the event of any ambiguity in this Agreement, or any matters to which this Agreement is silent, the Plan shall govern."[51] Thus, assuming *arguendo* that Section 1(b) of the RSU Award was ambiguous concerning whether the OIBA Target originally was intended as a vesting condition to satisfy the requirements of

---

[49] Friedman first referred to the disclosure in the 2010 proxy statement in her answering brief. Although it is not referenced in the complaint, I take judicial notice of it because its text cannot reasonably be disputed. *See Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *5 (Del. Ch. Dec. 22, 2010) ("For example, a court may take judicial notice of the contents of an SEC filing, but only to the extent that the facts contained in them are not subject to reasonable dispute.").

[50] Plan § 2(a)(vii) (emphasis added).

[51] RSU Award § 13.

Section 162(m) or whether it was merely intended to impose a separate vesting condition, the Compensation Committee had the authority to interpret Section 1(b) to resolve that ambiguity. The disclosures in the 2013 proxy statement, quoted above, which differentiate between the "business goal" tied to OIBA, on the one hand, and the EBITA/stock price targets that "were designed to satisfy the requirements of Section 162(m) of the Code," on the other hand, leave no doubt how the Compensation Committee would resolve that ambiguity.

Friedman makes two arguments in the alternative assuming the OIBA Target was not a pre-established performance goal for purposes of Section 162(m). First, Friedman argues that the OIBA Target was at least a "material term" of the RSU Award and that Section 162(m)(4)(C)(iii) of the Internal Revenue Code would prohibit payment to Khosrowshahi until all material terms of the RSU Award had been satisfied. Second, she argues that if the OIBA Target was an "other condition" as that term is used in Section 11(b) of the Plan, the decision to accelerate the vesting of the RSU Award violated Section 11(b)(i) of the Plan, which requires the satisfaction of any "other condition" before an award may become payable.[52]

Both of these arguments are unavailing for the same reason. They ignore the fact that the Compensation Committee waived the OIBA Target. As a result, the OIBA Target had been eliminated and was neither a "material term" nor an "other condition" of the RSU Award when it became payable.

---

[52] Pl.'s Answering Br. 20-21.

With the foregoing discussion of the parties' interpretations of the RSU Award in mind, I turn now to the application of the *Aronson* test.

## B.     The Failure to Make a Demand Was Not Excused.

Court of Chancery Rule 23.1 and Delaware law require that a stockholder initiating a derivative action plead "with particularity" either that demand was made on the corporation to initiate suit on its own, or that such demand "would have been futile."[53]  Having failed to make a pre-suit demand on Expedia's board, plaintiff must establish demand futility.

Under Delaware law, there are two tests for determining whether demand is futile. The parties agree that the two-prong test articulated in *Aronson v. Lewis* applies in this case.[54]  Under *Aronson*, where a decision of a corporation's board of directors is challenged, demand may be excused if particularized facts have been alleged to create a reasonable doubt either that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[55]  Absent such facts, the court will presume "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[56]

---

[53] *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

[54] *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).

[55] *Id*.

[56] *Id*. at 812.

22

Here, Friedman asserts that demand would be futile under either prong of *Aronson*. I disagree for the reasons stated below.

### 1. Demand is Not Excused Under the First Prong of *Aronson*

When this action was filed, the Expedia board had ten members, consisting of defendants Khosrowshahi, Diller, Kaufman, Battle, Dolgen, Jacobson, Kern, Malone, Tazon and non-party Coe. Thus, to prevail under the first prong of *Aronson*, the particularized facts of the complaint must create a reasonable inference that at least five of these individuals would be incapable of considering a demand because they are either interested or lack independence.[57]

Friedman does not challenge the independence or disinterestedness of directors Battle, Jacobson or Tazon. For purposes of my analysis, I assume Khosrowshahi had a material financial interest in the challenged transaction because he received a significant payment as a result of the Compensation Committee's decision to waive the OIBA Target and accelerate the vesting of the RSU Award. Therefore, Friedman must plead particularized facts from which the Court can infer that at least four of the remaining six directors are interested or lacks independence. Plaintiff has failed to make this showing.

---

[57] *In re The Limited, Inc. S'holders Litig.*, 2002 WL 537692, at *7 (Del. Ch. Mar. 27, 2002) ("[W]here the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent.").

### a.    Defendants Dolgen and Kern

Friedman argues that directors Dolgen and Kern, as members of the Compensation Committee that approved accelerating the vesting of the RSU Award, are interested because they face a substantial likelihood of liability.  The standard for pleading a substantial likelihood of liability is difficult to meet.[58]  Under *Aronson*, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge . . . the disinterestedness of directors."[59]  "Rather, the plaintiff must plead facts sufficient to show that approval of the transaction was 'so egregious on its face that . . . a substantial likelihood of director liability exists.'"[60]

Friedman relies on this Court's decisions in *Conrad v. Blank*[61] and *Ryan v. Gifford*[62] for the proposition that "allegations that a director approved compensation in violation of a stockholder-approved plan establishes a substantial likelihood of liability with respect to that director."[63]  In both *Conrad* and *Ryan*, however, the Court found that the allegations were sufficient to excuse demand because they raised an inference that

---

[58] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007).

[59] *Aronson*, 473 A.2d at 815.

[60] *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *18 (Del. Ch. May 5, 2010) (quoting *Aronson*, 473 A.2d at 815).

[61] *Conrad v. Blank*, 940 A.2d 28 (Del. Ch. 2007).

[62] *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007).

[63] Pl.'s Answering Br. 34.

members of the committee acted *knowingly* in violating a stockholder-approved plan.[64] Plaintiff's allegations do not support such an inference in this case.

To the contrary, for the reasons discussed above, I am of the opinion that the members of the Compensation Committee were permitted to waive the OIBA Target in accordance with the terms of the Plan based on a reasonable construction of the terms of the RSU Award. At most, Section 1(b) of the RSU Award was ambiguous, which would negate any inference of a "knowing" violation of the Plan, particularly since the Compensation Committee was authorized under the Plan to interpret the terms of an award in the case of ambiguity. Therefore, I conclude that the members of the Compensation Committee do not face a substantial likelihood of liability and that Friedman has failed to allege particularized facts creating a reasonable doubt concerning disinterestedness or independence of directors Dolgen or Kern.

### b. Defendants Malone and Coe

Friedman argues that directors Malone and Coe will not be able to consider impartially a demand to institute an action against Fitzgerald, who left the Expedia board before this action was filed, based on their "long-standing relationship" with him and

---

[64] *Conrad*, 940 A.2d at 40 ("Suffice it to say that . . . the court concludes that the allegations of the complaint are sufficient to excuse demand on the members of the compensation committee, since they raise . . . a reasonable inference that the compensation committee members acted *knowingly* in awarding options priced at dates other than the actual dates of the grant.") (emphasis added); *Ryan v. Gifford*, 918 A.2d 341, 355 n.35 (Del. Ch. 2007) ("Defendants also object that plaintiff's allegations are not particularized for purposes of Rule 23.1 because they do not directly allege knowledge on behalf of the directors. Yet, it is difficult to understand how a plaintiff can allege that directors backdated options *without* simultaneously alleging that such directors *knew* that the options were being backdated.").

25

because Fitzgerald faces a substantial likelihood of liability as a member of the Compensation Committee that approved the waiver of the OIBA Target.[65]

Regarding Malone, the complaint alleges that Fitzgerald held various positions at Tele-Communications, Inc. from 1996 to 2000 when Malone was either the Chief Executive Officer or Chairman of the Board, and that Fitzgerald was a Senior Vice President at Liberty from 2000 to 2011, which was controlled by Malone, and at Starz from 2011 to 2012, where Malone served as Chairman of the Board.[66] The complaint also alleges that Fitzgerald and Malone served as directors together on the Expedia board from 2006 to 2012 and on the Ascent Capital Group board from 2010 to 2012.[67]

Regarding Coe, the complaint alleges she provided legal services to Liberty on a consulting basis for at least three years and later served as Liberty's Deputy General Counsel while Fitzgerald was a Senior Vice President of Liberty, and that she, like Fitzgerald, joined Expedia's board as a nominee of Liberty.[68]

I conclude that Friedman has failed to allege particularized facts creating a reasonable doubt concerning the disinterestedness or independence of either Malone or Coe for two inter-related reasons. First, for the reasons discussed above regarding the other members of the Compensation Committee, Friedman has failed to allege

---

[65] Compl. ¶ 70.

[66] *Id.* ¶¶ 70-72.

[67] *Id.* ¶¶ 72-73.

[68] *Id.* ¶ 74.

26

particularized facts establishing that Fitzgerald faces a substantial likelihood of liability for approving the waiver of the OIBA Target as a member of the Compensation Committee. Second, as this Court has held, the "naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence."[69] The allegations of the complaint are of this ilk. The allegations concerning the business relationship between Coe and Fitzgerald merely show that their paths crossed at Liberty. Although Malone's alleged business relationship with Fitzgerald is more extensive, it is difficult to fathom how Fitzgerald reasonably could be said to have any leverage over Malone who is alleged to be "one of the richest men in the world" and to have been in superior positions to Fitzgerald at TCI, Liberty and Starz.[70]

* * * * *

For the foregoing reasons, I conclude that Friedman has failed to allege particularized facts to create a reasonable doubt concerning the disinterestedness or independence of at least seven (Battle, Jacobson, Tazon, Dolgen, Kern, Malone and Coe)

---

[69] *Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002); *see also In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013) ("Our law is clear that mere allegations that directors are friendly with, travel in the same social circles, or have past business relationships with the proponent of a transaction or the person they are investigating, are not enough to rebut the presumption of independence.").

[70] Compl. ¶¶ 70-73.

of the ten members of Expedia's board when this action was filed.[71]  Thus Friedman has failed to carry her burden to establish demand futility under the first prong of *Aronson*.

### 2. Demand is Not Excused Under the Second Prong of *Aronson*

Plaintiff has a "heavy burden" to establish that the second prong of *Aronson* has been satisfied.[72]  To do so, she "must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision."[73]

Friedman does not allege that the Expedia board was inadequately informed, but instead contends that accelerating the vesting of the RSU Award was a clear violation of the Plan that could not have been a valid exercise of business judgment.[74]  In support of this argument, Friedman relies on a line of cases emanating from this Court's decision in *Sanders v. Wang*,[75] where, according to Friedman, the "Court held that a board's violation of an unambiguous provision of such a plan *ipso facto* establishes demand futility under the second prong of *Aronson*."[76]

---

[71] Having considered the allegations pertaining to these seven directors, I need not analyze the allegations concerning directors Diller or Kaufman and reach no conclusions concerning their disinterestedness or independence.

[72] *White v. Panic*, 783 A.2d 543, 551 (Del. 2001).

[73] *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003).

[74] Pl.'s Answering Br. 23-29.

[75] *Sanders v. Wang*, 1999 WL 1044880 (Del. Ch. Nov. 10, 1999).

[76] Pl.'s Answering Br. 23.

In *Sanders*, plaintiffs alleged that the members of the board of directors of Computer Associates International, Inc. breached their fiduciary duties of loyalty and care by awarding certain executives millions of shares more than the board was authorized to award under the company's 1995 Key Employee Stock Ownership Plan (KESOP).[77] Applying the second prong of *Aronson*, the Court found "that the facts alleged raise[d] a reasonable doubt that the share transaction resulted from a valid exercise of business judgment" and that demand was excused because "plaintiffs have sufficiently alleged facts which, taken as true, show that the CA board violated an express KESOP provision."[78]

Friedman cites three other cases decided after *Sanders* in which this Court similarly found demand to be excused under the second prong of *Aronson* where the board allegedly had violated a compensation plan.[79] In each of these cases, the Court determined that demand was excused because plaintiff had sufficiently alleged a clear or intentional violation of a compensation plan.[80]

---

[77] *Sanders*, 1999 WL 1044880, at *2.

[78] *Id.* at *5.

[79] *Cal. Pub. Emps.' Ret. Sys. v. Coulter*, 2002 WL 31888343 (Del. Ch. Dec. 18, 2002); *Weiss v. Swanson*, 948 A.2d 433 (Del. Ch. 2008); *Pfeiffer v. Leedle*, 2013 WL 5988416 (Del. Ch. Nov. 8, 2013).

[80] *Coulter*, 2002 WL 31888343, at *11 ("Thus, plaintiff alleges with particularity that repricing of directors' options in 1997 and 1999 was *ultra vires*."); *Weiss*, 948 A.2d at 447 ("[T]he allegations support an inference that the Director Defendants did not disclose the practices challenged in this case, and therefore the complaint must be read as giving rise to a reasonable inference that the directors intended to circumvent the restrictions of the plans."); *Pfeiffer*, 2013 WL 5988416, at *8 ("Pfeiffer has pled facts sufficient to support a reasonable inference that the Board clearly violated the unambiguous Stock

In contrast to *Sanders* and its progeny, Friedman has not alleged with particularity a clear or intentional violation of a compensation plan in this case. To the contrary, for the reasons explained above, it is my opinion that the Compensation Committee was authorized under the Plan to waive the OIBA Target because, based on a reasonable construction of the RSU Award, the OIBA Target was not intended to satisfy the performance goal requirement of Section 162(m). At most, Friedman's interpretation of the RSU Award raises a potential ambiguity that the Compensation Committee was entitled to interpret and resolve under the Plan. Thus, demand is not excused under the second prong of *Aronson* because Friedman has failed to allege particularized facts to support an inference of bad faith on the part of any of the defendant directors sufficient to raise a reasonable doubt that the decision to waive the OIBA Target was anything other than the product of a valid business judgment.[81]

Friedman argues, alternatively, that demand is excused under the second prong of *Aronson* because defendants adopted and asked the stockholders to approve an

---

Option limitations prescribed in Section 4 in each of those years. Therefore, based on the logic of *Sanders*, demand is excused under the second prong of the *Aronson* test.").

[81] This case more closely resembles three recent decisions of the United States District Court of the District of Delaware. *See Abrams v. Wainscott*, 2012 WL 3614638, at *3 (D. Del. Aug. 21, 2012) (demand not excused under *Aronson*'s second prong because plaintiff's allegations did not support an inference that the compensation plan was knowingly or intentionally violated); *Freedman v. Redstone*, 2013 WL 3753426, at *9 (D. Del. July 16, 2013) ("Plaintiff at bar has not alleged that the Committee made a knowing and intentional decision to violate the terms of the 2007 Plan."); *Freedman v. Mulva*, 2014 WL 975308, at *4 (D. Del. Mar. 12, 2014) ("Freedman has not alleged that the Directors made a knowing and intentional decision to violate the terms of the 2011 Plan.").

30

amendment to Sections 11(b) and 12(d) of the Plan in 2013 to remove the prohibition on amending a Qualified Performance-Based Award in a way that would cause the award to cease to qualify for an exemption under 162(m). According to Friedman, "[d]efendants sought to hide the violation from Expedia's shareholders and thereby breached their duty of loyalty."[82] The defect in this argument is that Friedman has failed to allege a clear or knowing violation of the Plan in the first place for the reasons discussed above and, thus, there is no basis to infer a breach of the duty of loyalty in effectuating the amendment to Sections 11(b) and 12(d) of the Plan as part of some alleged "cover-up." Thus, Friedman's alternative theory also fails to establish demand futility under the second prong of *Aronso*n.

## C. Unjust Enrichment

In Count II, Friedman alleges that Khosrowshahi was unjustly enriched when he "received unauthorized personal financial benefits by accepting the improperly vested RSU Award in violation of the Plan's express terms."[83] This claim is derivative of the fiduciary duty claim discussed above. Applying the same logic, Friedman has failed to allege particularized facts creating a reasonable doubt concerning the capacity of the Expedia board to consider impartially a demand to pursue the unjust enrichment claim under either prong of *Aronson*.

---

[82] Pl.'s Answering Br. 29.

[83] Compl. ¶ 82.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss both claims in the complaint under Court of Chancery Rule 23.1 for failure to adequately plead demand futility is GRANTED. The complaint is dismissed in its entirety with prejudice.

**IT IS SO ORDERED.**